**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NEW CIVIL LIBERTIES ALLIANCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 22-3567 (CJN) |
| | ) |
| SECURITIES AND EXCHANGE | ) |
| COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................2

1.      The SEC's Administrative Enforcement Structure...............................................2

2.      The SEC's "Control Deficiency."........................................................................3

3.      The Cochran Decision at the Supreme Court……………………..……………………6

4.      The June 2 Press Release……………………………………………………………6

5.      The Instant FOIA Case……………………………………………………………7

LEGAL STANDARD...........................................................................................................8

ARGUMENT…………………………………………………………………..……………10

I.      By Simply Referring Plaintiff to a Press Statement, Defendant Does Not Satisfy its
        Burden to Adequately Search for Records or to Respond to Plaintiff's FOIA Request....10

II.     Summary Judgement is Inappropriate Because Defendant's Vaughn Index Provides
        Only Boilerplate, Repetitive, and Insufficiently Detailed Assertions of Why the
        Records are Privileged and Covered by Exemption 5 or 6................................................13

III.    Defendant Does Not Show the Harm Needed to Withhold or Redact the Responsive
        Records it Does Acknowledge...........................................................................................30

CONCLUSION.....................................................................................................................34

**INTRODUCTION**

Plaintiff was forced to file this suit under the Freedom of Information Act, 5 U.S.C. § 552 *et seq*. ("FOIA"), after the SEC refused to comply with its statutory obligations and had made clear its intent to indefinitely withhold the requested documents.[1] The motive behind the agency's defiance is obvious—disclosure of the records will expose an internal scheme of illegal misconduct in the administration of the SEC's unconstitutional in-house court system and its attempt to control the fallout from the scandal. But the agency's fears of embarrassment are not among the statutory exemptions that would allow it to withhold records under FOIA, the very purpose of which is to act as a "check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co*., 437 U.S. 214, 242 (1978). By flouting the fundamental requirements of FOIA, the agency seems determined to avoid that accountability.

There is no genuine issue of material fact controverting the averments in the Complaint, and the agency has not submitted any evidence, admissible or otherwise, which explains its failure to comply with the law. This brand of agency chicanery is one of the reasons why "FOIA cases typically and appropriately are decided on motions for summary judgment." *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012). At the summary judgment stage "the court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA." *Buzzfeed, Inc. v. U.S. Dep't of Homeland Sec.*, 610 F. Supp. 3d 139, 144 (D.D.C. 2022). This is a burden the SEC cannot meet and has made no effort at all to meet; the agency simply has not complied with FOIA.

---

[1] Even after litigation began following months of agency delay, the SEC continued to assert it would take approximately three years to prepare this case for summary judgment. Hardin Declaration, Exhibit B.

SEC has violated the Freedom of Information Act ("FOIA") by referring Plaintiff to a press release rather than responding to one portion of the Plaintiff's FOIA request, and by redacting heavily or even in full documents responsive to the other portion. Because the SEC's practice of "government by press release" is so unusual, and because it sheds light on the importance of the documents requested and the necessity for releasing them over the SEC's risible assertions that release will cause "foreseeable harm," Plaintiff briefly recounts here the context of its request and the SEC's response. Plaintiff then turns to the merits, including why SEC cannot satisfy its FOIA obligations via press releases and why the information it continues to withhold is improperly withheld.

## FACTUAL AND PROCEDURAL BACKGROUND

The broader factual context in which Plaintiff's FOIA request was filed is necessary to explain the meaning of the records sought, the significance of the request, and the underlying motives of the agency in scorning FOIA's demands. "[E]vidence of agency bad faith" is recognized as probative of the agency's noncompliance. *See Jud. Watch, Inc. v. Dep't of Just.*, 619 F. Supp. 3d 69, 75 (D.D.C. 2022).

**1. The SEC's Administrative Enforcement Structure**

The FOIA request that ultimately led to this litigation arose out of SEC's practice of bringing enforcement actions before Administrative Law Judges instead of in federal courts. In *Cochran v. United States SEC*, 20 F.4th 194, 198 (5th Cir. 2021), the Fifth Circuit summarized the history of that formative case:

> In April 2016, the Securities and Exchange Commission ("SEC") brought an enforcement action against Michelle Cochran, a certified public accountant… After a hearing, an SEC administrative law judge ("ALJ") ruled against Cochran, imposing a $22,500 penalty and a five-year ban on practicing before the SEC. The SEC adopted the ALJ's decision. Cochran objected.

2

Before the SEC ruled on Cochran's objection, the Supreme Court intervened. In *Lucia v. SEC*, the Court held that SEC ALJs are officers of the United States under the Appointments Clause, who must be appointed by the President, a court of law, or a department head. 138 S. Ct. 2044, 2049, 2051, 201 L. Ed. 2d 464 & n.3 (2018). Because the ALJ who had issued the initial decision in *Lucia* had not been appointed by a person or entity in one of those three categories (but had instead been appointed by SEC staff members), the Court remanded the case to the SEC for further proceedings before a constitutionally appointed ALJ. Id. at 2050, 2055.

In response to *Lucia*, the SEC remanded all pending administrative cases for new proceedings before constitutionally appointed ALJs. Cochran's case was reassigned to a new ALJ.

Cochran filed suit in federal district court to enjoin the SEC's administrative enforcement proceedings against her. Though the SEC had fixed the appointment problem *Lucia* addressed, Cochran contended it did not fix a removability problem *Lucia* declined to reach: she alleged that, because SEC ALJs enjoy multiple layers of "for-cause" removal protection, they are unconstitutionally insulated from the President's Article II removal power. Cochran also asserted that the SEC violated her due process rights by failing to adhere to its own rules and procedures.

## 2.  The SEC's "Control Deficiency."

Just as the *Cochran* case was headed to the Supreme Court, the SEC disclosed damning evidence confirming the worst fears of those who had long challenged the constitutionality of SEC administrative enforcement actions. On April 5, 2022, the SEC filed a Notice with the Supreme Court and district court in *Cochran*[2] and also with the Fifth Circuit in *Jarkesy v. SEC*,[3] a case raising similar constitutional challenges to the combination of prosecutorial and adjudicatory functions in a single agency. The notice disclosed:

> The Commission has identified a control deficiency related to the separation of its enforcement and adjudicatory functions within its system for administrative adjudications …

> The Commission has determined that, for a period of time, certain databases maintained by the Commission's Office of the Secretary were not configured to

---

[2] Letter from Elizabeth Prelogar to Supreme Court dated April 8, 2022, available at https://www.supremecourt.gov/DocketPDF/21/21-1239/220641/20220408165202974_Letter%2021-1239%20final.pdf in *Securities and Exchange Commission, et al. v. Michelle Cochran*, U.S. Supreme Court Case No. 21-1239.

[3] *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), Notice in Case No. 20-61007, Document 117.

> restrict access by Enforcement personnel to memoranda drafted by Adjudication staff. As a result, in a number of adjudicatory matters, administrative support personnel from Enforcement, who were responsible for maintaining Enforcement's case files, accessed Adjudication memoranda via the Office of the Secretary's databases. Those individuals then emailed Adjudication memoranda to other administrative staff who in many cases uploaded the files into Enforcement databases.

As the Wall Street Journal put it

> It's the equivalent of a party in litigation having access to a judge's briefs from her law clerks … This breach reinforces the problem with the SEC's administrative process in which the commission has total discretion to deprive parties of their ability to have matters litigated in federal court.[4]

University of Tennessee Law Professor Glenn Reynolds, blogging at his Instapundit, declared: "The SEC needs a Special Counsel Investigation," stressing,

> Understand: The "prosecutors" at the SEC illegally accessed filed belonging to the "judges." This raises serious questions about the trustworthiness of the SEC, and demands an outside investigation with subpoena power.[5]

New Civil Liberties Alliance ("NCLA"), which had served as counsel for Michelle Cochran, promptly filed a FOIA request with the SEC for production of all records relevant to this "control deficiency" in June of 2022. Other than a copy of the SEC's contract with the Berkeley Research Group ("BRG") to conduct an internal investigation (with information about the cost of the contract redacted), NCLA received no production from the SEC office in charge of FOIA compliance. That stonewalled FOIA request is now before this Court.

On July 19, 2022, the House Financial Services Committee on Oversight of the SEC called SEC Chairman Gary Gensler for questioning on the "control deficiency," who sent SEC Director of Enforcement Gurbir Grewal in his stead. Asked if SEC's Inspector General ("IG") was

---

[4] Dave Michaels, *SEC Says Employees Improperly Accessed Privileged Legal Records*, WALL ST. J. April 6, 2022.  https://www.wsj.com/amp/articles/sec-says-employees-improperly-accessed-privileged-legal-records-11649205758.
[5] https://instapundit.com/515245/.

investigating, Grewal claimed ignorance, telling Rep. William Huizenga: "You would have to ask the Inspector General."[6] There is no evidence, one way or the other, whether the SEC Inspector General has investigated the SEC's "control deficiency." Instead, and despite the provisions of the Inspector General Act, 5 U.S.C. § 401 *et seq*. providing for a taxpayer-funded office to address just such internal agency problems, SEC hired BRG to conduct what it prefers to call an "internal investigation."   Public records show that BRG provides expert witness services to SEC in its enforcement actions under contracts totaling millions of dollars.[7]

The notices filed with the *Cochran* and *Jarkesy* courts represented that BRG found, to paraphrase, "nothing to see here," while adding that the investigation was not complete and the breach had occurred in other, unnamed cases.

Grewal represented to Congress that the control deficiency was publicly reported when it happened.[8] Later in the hearing, Rep. Huizenga presented Grewal with information from the Wall Street Journal that the breach dated back to 2017. Rep. Huizenga also countered Grewal with information that the Wall Street Journal had reported that SEC discovered the breach in the fall of 2021. The control deficiency was first disclosed to the courts and two of the affected parties only in April of 2022.  At the end of the hearing, Rep. Huizenga admonished Grewal for his lack of transparency, incorrect answers, and testimony that was "too little, too late—neither side got answers."[9]

---

[6] U.S. House Committee on Financial Services-Oversight of the SEC's Division of Enforcement, Hearing Held July 19, 2022, video available at https://youtu.be/hlYJ4aa8k2I?t=1570 26:00-28:00
[7] Federal Procurement Data System (last visited Aug. 2, 2023),
https://www.fpds.gov/ezsearch/search.do?q=Berkeley+Research+Group+DEPARTMENT_FULL_NAM
E%3A%22SECURITIES+AND+EXCHANGE+COMMISSION%22&s=FPDS.GOV&templateName=1.
5.3&indexName=awardfull (contracts between BRG and SEC).

[8] *Id*., https://youtu.be/hlYJ4aa8k2I?t=1570..
[9] *Id*., https://youtu.be/hlYJ4aa8k2I?t=1570 at 1:27:46 – 1:28:51.

### 3.  The Cochran Decision at the Supreme Court

On April 14, 2023, the Supreme Court held in *Axon Enterprise Inc. v. FTC*[10] that constitutional questions raising "separation of powers principles … as well as the combination of prosecutorial and adjudicatory functions in a single agency" raise "fundamental, even existential" challenges that "the agencies, as currently structured, are unconstitutional in much of their work" should be heard in district court before the constitutional injury takes place.

### 4.  The June 2, 2023 Press Release

Before Cochran could file a complaint in district court, the SEC dismissed her administrative case as part of an unprecedented agency dismissal of all 42 open proceedings that could have brought these questions to an Article III Court. Forty-five industry bar orders were also lifted. A ten-year quest by numerous plaintiffs nationwide for judicial review of the SEC's unconstitutional proceedings was eviscerated, to say nothing of SEC deep-sixing untold years of enforcement resources  that cost millions of taxpayer dollars.

The reason the SEC gave for its unprecedented, sweeping attempt to insulate its administrative processes from judicial review was its "control deficiency." The SEC announced its decision by press release, which it later provided to undersigned counsel for the Plaintiff in this action, declaring that the SEC had no additional information to provide. Hardin Declaration, Exhibit A.

The SEC's unprecedented dismissal orders and lifts of industry bars in nearly 90 matters were accompanied by a report apparently prepared by BRG. That report raises more questions than it answers, is long on conclusory exculpatory statements and devoid of primary documents, interviews, or any other material that Cochran and others could have readily obtained in litigation

---

[10] 143 S.Ct 890 (2023).

to test the SEC's *ipse dixit* claims in its 2022 Notices and the 2023 BRG press release report that there is "nothing to see here." SEC has taken the position in this FOIA litigation that this is all the public, and the Plaintiff, will get. The SEC report specifically refuses to provide information regarding enforcement targets in closed or settled cases tainted by the "control deficiency," even though they may be the ones most damaged by a corrupted prosecution.

The SEC's malfeasance has gone on far too long—since at least 2017 if press reports are to be believed.  The SEC's summary dismissals effectuates a massive nullification of constitutional rights.

SEC's undeniable goal in this litigation is to bury the record of what went on, and use the "control deficiency" as a ploy to control the federal dockets by dismissing any case that could bring to an Article III court what the *Axon/Cochran* Court called the "fundamental, even existential" claims that SEC, "as currently structured [is] unconstitutional in much of [its] work."

**5.  The Instant FOIA Case**

Plaintiff's suit here arises from the Freedom of Information Act.

SEC's violations of that Act are laid bare first by SEC's *Vaughn* Index lacking sufficient detail to support either its withholdings or the idea that there is no reasonably segregable information in these records. SEC's justifications for why the records (many of which were shared outside the agency with contractors it brought on specifically to circumvent, or *de facto* displace, Inspector General review) are allegedly covered by FOIA's Exemption 5 are boilerplate and repetitive. Thus, SEC fails to establish that the withheld information is covered by the deliberative process privilege articulated by FOIA's Exemption 5. To the extent SEC raises Exemption 6 at all, it has not properly balanced a personal privacy interest against the extreme public interest in discerning the facts of the SEC's most unusual investigation of itself. Further, and separately, a

7

freestanding reason why SEC's withholdings are invalid is that it has not shown that disclosure of any of the records, in whole or in part, would cause harm, as the 2016 FOIA Amendments require for withholding even exempt information. Nor has Defendant explained how it can satisfy a FOIA request by simply releasing a statement to the press and referring a requester's counsel to that release, as opposed to independently satisfying the obligation to search for and provide records to the individual who requested such records.

In the instant matter, the SEC redacted emails ("Category 1" records) and declared that a press release with links satisfies Plaintiff's "Category 2." Plaintiff's position is that, even accepting, *arguendo*, the propriety of "response by press release," there remains the issue of records in the closed cases as the SEC's press release only addressed the open ones. The SEC then insists that there are no closed cases (or at least that it has made no determinations with respect to such cases), and that there are therefore no records being withheld, notwithstanding that the multiple links in this fractured chain of agency reasoning are not supported or explained in any declaration, anywhere, and the agency performed no relevant search for potentially responsive records from any closed cases which, as the record as described, *infra*, affirms, do exist.

As such, SEC has not met its undeniable burden to show and support that it produced all reasonably segregable records responsive to Plaintiff's FOIA requests.

## LEGAL STANDARD

FOIA was enacted "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S. Ct. 541, 116 L. Ed. 2d 526 (1991) (cleaned up). Under FOIA, an agency is obligated to demonstrate that "each document that falls within the class requested" has either "been produced" or is "exempt." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978). The agency bears the "burden of showing that its

search was adequate," rather than the FOIA requestor having to prove that it was inadequate. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir.1994). The burden never shifts to the plaintiff at any stage. *Nat'l Sec. Counselors v. CIA*, 320 F. Supp. 3d 200, 209 (D.D.C. 2018)

In a lawsuit under the Freedom of Information Act, the "burden is on the agency to demonstrate, not the requester to disprove, that the materials sought … have not been 'improperly' 'withheld.'" *Department of Justice v. Tax Analysts*, 492 U.S. 136, 142 n. 3 (1989).

"The burden is on the agency to prove de novo in trial court that the information sought fits under one of the exemptions to the FOIA." *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973). Because of FOIA's presumption in favor of disclosure, exemptions are "narrowly construed." *FBI v. Abramson*, 456 U.S. 615, 630 (1982); *accord Dep't of Air Force v. Rose,* 425 U.S. 352, 360–61 (1976); *Loving v. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008).

Moreover, "Under the FOIA Improvement Act of 2016, the government may not withhold even those privileged materials unless it also 'reasonably foresees that disclosure would harm an interest protected by' the FOIA exemption." *Reporters Committee v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021), *citing* 5 U.S.C. § 552(a)(8)(A)(i)(I). This "reasonable foreseeability of harm" standard requires the withholding agency to provide "context or insight into the specific decision making processes or deliberations at issue, and how they in particular would be harmed by disclosure" of the contested records. *Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 17-0832 (CKK), 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019). That is, the agency must demonstrate the foreseeability of harm, as well as the existence of an otherwise exempt exchange.

An agency's summary-judgment declarations to support these withholdings must contain "reasonable specificity of detail rather than merely conclusory statements," that "are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Judicial*

*Watch. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013). A declaration must therefore "provide detailed and specific information demonstrating that material withheld is logically within the domain of the exemption claimed." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998), as amended (Mar. 3, 1999).

Even when an agency carries its burden to demonstrate that *some* material may be exempt, the agency nevertheless has a duty to "segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii). This duty is so essential that even if the FOIA requester does not challenge the agency's failure to release nonexempt information, "the District Court ha[s] an affirmative duty to consider the segregability issue *sua sponte*." *Transpacific Policing v. U.S. Customs*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

## I. By Simply Referring Plaintiff to a Press Statement, Defendant Does Not Satisfy its Burden to Adequately Search for Records or to Respond to Plaintiff's FOIA Request.

SEC's motion and its decision to simply refer to a press release rather than respond to the Plaintiff's FOIA request calls into question the adequacy of SEC's search for records and its general process for responding to the Plaintiff's FOIA request. These questions cannot be answered by SEC's declarants and are apparent on the face of the record.

In order to meet the standard required for an adequate FOIA search, the agency must make "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *ACLU v. Dep't of Homeland Sec.*, Civil Action No. 20-3204 (RDM), 2023 U.S. Dist. LEXIS 57430, at *16 (D.D.C. Mar. 31, 2023) citing *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68, 287 U.S. App. D.C. 126 (D.C. Cir. 1990).

An adequate search may be supported by "[a] *reasonably detailed* affidavit [or declaration], setting forth the search terms and the type of search performed, and averring that all files likely to

contain responsive materials (if such records exist) were searched." *Id.* (emphasis added). "Although a requester must reasonably describe the records sought, an agency also has a duty to construe a FOIA request liberally." *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890, 315 U.S. App. D.C. 177 (D.C. Cir. 1995).

SEC's declarations barely support the notion that *any* type of a search for responsive documents was conducted, and the SEC's description of the search does not meet the applicable legal standard. First, there is the Declaration of Lizzette Katilius, who is the "Branch Chief" of SEC's FOIA Office. ECF No. 16-2. Ms. Katilius asserts, about her responsibility for the process, only that "I am responsible for, among other things, coordinating and processing FOIA requests, organizing searches for documents responsive to FOIA requests, making determinations as to whether requested information is exempt from disclosure under FOIA, and communicating with FOIA requesters." She asserts that SEC provided certain records but says nothing about the redaction process or how SEC determined that no "Category 2" records existed or were being withheld.[11] Second, there is the Declaration of Mark Tallarico. ECF No 16-3. Mr. Tallarico is an attorney and "FOIA Liaison." His Declaration states only that "The SEC has not withheld any information in connection with the Second Category" (¶ 25) and that because the SEC provided a press release to Plaintiff on June 13, 2023 (after providing it to the press on June 2, 2023) that SEC had therefore "allowed" Plaintiff access to the records it requested in that category (¶23). Mr. Tallarico's characterization of correspondence between counsel has compelled Plaintiff to supplement the record with the Hardin Declaration (and its accompanying Exhibit A), Tallarico does not explain, in ¶ 23 of his Declaration or elsewhere, how SEC made the determination that it

---

[11] SEC's assertions in its correspondence attached as Exhibit A to the Hardin Declaration appear to be entirely unsupported in this litigation by any admissible evidence.

possessed no additional records relating to closed or settled cases and whether such determination was based upon a search.

The SEC has failed to carry its burden of proof for two basic reasons:  First, because the SEC has failed entirely to explain how the repositories of records were searched and by whom, its Declarations are insufficient to permit Plaintiff (or indeed the Court) to determine the sufficiency of the search. Second, to the extent the SEC has simply concluded that by providing a copy of a press release it has therefore satisfied Plaintiff's request for records, the SEC has failed to explain how the press release was determined to include all records requested by Plaintiff and whether the press release was itself based on an adequate search of all repositories or files. The SEC has additionally failed to explain as a general matter how providing a press release can ever satisfy a FOIA request, unless the request sought that press release by name or description, insofar as press releases and FOIA responses are fundamentally different species of documents with different purposes and different characteristics.

With respect to the adequacy of SEC's declaration, Plaintiff notes that declarations that "do not denote which files were searched or by whom" or "do not provide information specific enough to enable [the plaintiff] to challenge the procedures utilized," have been held to be "inadequate and too conclusory to justify a grant of summary judgment." *Santos v. Drug Enforcement Agency*, 357 F.Supp.2d 33, 37 (D.D.C. 2004) (quoting *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 371 (D.C.Cir.1980) (affidavit that fails to "denote which files were searched or by whom" is insufficient); see also *Steinberg v. Department of Justice*, 23 F.3d 548, 552-553 (D.C. Cir. 1994) (finding description of search, such as reference to what "EOUSA" office did, inadequate because it failed "to describe in any detail what records were searched" and "by whom"); *Murray v. BOP*, 741 F.Supp.2d 156, 163 (D.D.C. 2010) ("affidavits or declarations

submitted by the agency...must describe what records were searched, by whom") (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 92 (D.D.C. 2009)).

This same deficiency is present in SEC's declarations here. The agency has made a remarkable and sweeping assertion that it has no records whatsoever to provide Plaintiff, outside of a copy of a press release its counsel provided to Plaintiff eleven days after the release was provided to the media. But the agency hasn't bothered to back up the remarkable and unprecedented suggestion that it can respond to a FOIA request by way of a self-serving press release. SEC provides no assurances that this provision of a *post facto* press release with links to records represents the universe of records sought or what type of search it conducted in order to determine that it did or did not possess the actual records Plaintiff requested. It is a dismissive, even farcical response to Plaintiff's request.

The Court should require SEC to submit admissible evidence that explains where – if anywhere – SEC searched for records responsive to the second category of records at issue, why SEC conducted its search in the way that it did, who conducted the searches, and why, other than perfunctory reasons, the agency should be permitted to assert that no additional records exist in the absence of any evidence regarding the search or a declaration from an individual involved in the underlying events regarding the existence or non-existence of records not contained in that press release.

**II.    Summary Judgement is Inappropriate Because Defendant's Vaughn Index Provides Only Boilerplate, Repetitive, and Insufficiently Detailed Assertions of Why the Records are Privileged and Covered by Exemption 5 or 6.**

Defendant has not met a basic, threshold requirement for a Vaughn Index, ECF No. 16-4, which requires presenting how and why the withheld information is exempt under a claimed privilege.

The SEC asserts that the records it has identified in its press release are responsive "Category 2" records because they met the following description provided in Plaintiff's request: "the report or reports prepared by Berkeley Research Group (BRG), with all supporting documents, interviews, statements etc." ECF No. 16-3, ¶ 5. SEC has the burden of demonstrating its withholding is appropriate for each and every record and portion of a record. Particularly given the certain existence of closed cases affected by the "control deficiency," the SEC's failure to search its closed cases for or provide and records related to one category of plaintiff's request, necessarily fails to meet even the most basic of its statutory obligations under FOIA. By shielding numerous parts of many documents and the entirety of each and every word of other responsive records, SEC surely shields more than truly "deliberative" information relating to agency decisions shared between covered individuals from view. Shielding the entirety of every undisclosed document *in toto*, SEC inherently has hidden factual and nondeliberative material from view. And insofar as SEC admits – and the underlying request necessarily called for – communications between SEC and outside actors at the Berkley Research Group — SEC also must demonstrate how this sort of information can be shielded under Exemption 5 at all. In addition, SEC's redaction of the cost information in the BRG contract is absurd. The public is clearly entitled to know the cost of retaining this friendly vendor to investigate rather than following the provisions of the IG Act.

### A) Exemption 5 does not Apply to the Records at Issue.

Defendant has withheld almost the entirety of some records, which are referred to herein as "Category 1" records, under Exemption 5, and cites Exemption 5 with respect to each and every withholding which it acknowledges in its Vaughn Index (occasionally alongside another Exemption). The SEC cites the deliberative process privilege and occasionally also the attorney

14

work product privilege. See Vaughn Index at 1 (ECF No. 19-4); ECF No. 19-1 at 9. The SEC is wrong to do so for at least three fundamental reasons:

*First,* because the SEC has not established that it was engaged in "deliberations" or similar activities relating to final agency decision making or policy, the agency cannot establish that Exemption 5 protects the records in any fashion. *Second*, because the correspondence was necessarily already shared outside the government, the government cannot now refuse to share this same information under FOIA. To the extent that this Court recognizes the so-called "consultant corollary," it does not apply to the records at issue which were generated in an intentional and deliberate scheme to evade the requirements of the Inspector General Act. And the consultant corollary is itself a judicial innovation that directly conflicts with the plain text of FOIA. *Georgia v. United States DOJ*, No. 1:21-cv-03138 (TNM), 2023 U.S. Dist. LEXIS 28341, at *9 (D.D.C. Feb. 20, 2023), citing, inter alia, *Lucaj v. FBI*, 852 F.3d 541, 548-49 (6th Cir. 2017) and *Rojas v. FAA*, 989 F.3d 666, 673-74 (9th Cir. 2021) (en banc), 989 F.3d at 683-90 (Wardlaw, J., concurring in part and dissenting in part) (dissenting from decision to recognize consultant corollary). *Third*, to the extent that Exemption 5, Exemption 6, or any other doctrine or privilege ever applied to the requested records, any claim has been waived by sharing the information at issue with favored parties while simultaneously attempting to hide it from Plaintiff.

### i)   The SEC Has Not Established that the Deliberative Process Privilege Applies.

The SEC cannot establish that Exemption 5 applies to the records at issue in this case at all, regardless of whether it attempts to do so by relying on the "deliberative process" prong of that Exemption or the "attorney work product" prong.

"Recommendations from subordinates to superiors lie at the core of the deliberative-process privilege," *Amadis v. United States Dep't of State*, 971 F.3d 364, 370 (2020), but the SEC

has not bothered to explain who was making recommendations to whom in this case, much less whether the "recommenders" were inside or outside the agency or what the relevant final agency decision was. See *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 512-13 (2010) (for the proposition that at an independent agency, the Commissioners are collectively the agency "head" to whom recommendations are made). A record is not "deliberative," and thus is not covered by deliberative process privilege, unless "it 'reflects the give-and-take of the consultative process." *CREW v. DOJ*, 45 F.4th 963, 972 (D.C. Cir. 2022) (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006)).

Mere reporting of forensic irregularities or even discussion regarding the consequences of such irregularities does not reflect any such "give-and-take." Internal discussions are not privileged at all if they are "peripheral to actual policy formulation," *Ethyl Corp.*, 25 F.3d at 1248, or if they apply existing policy to newly arising facts. Even internal evaluations of agency policy that are far more connected to policy formulation than a mere topic such as a "control deficiency" can be beyond the reach of the deliberative-process privilege, no matter how chilling their disclosure might be. See *Vaughn v. Rosen*, 523 F.2d 1136, 1143 (D.C. Cir. 1975) (finding an agency's efforts to evaluate and change its personnel policies, rules and standards too amorphous to qualify as a process for the purposes of the deliberative process privilege).

Moreover, some policy decisions are just too trivial to be the "stuff" of deliberative process privilege. See *Hennessey v. US AID*, No. 97-1113, 1997 WL 537998, at *6 (4th Cir. Sept. 2, 1997) (agency contract dispute was not the "stuff" of deliberative process privilege). Defendant's explanation of its withholdings gives no hint as to what specific policy decisions – as opposed to generalized topics — the redacted information might relate to, and whether they have any real significance. It is not enough that a redaction relates to a proposed policy without

being more specific. As the D.C. Circuit explained in *CREW v. DOJ*, 45 F.4th 963, 972 (D.C. Cir. 2022), "Assessing whether a record is pre-decisional or deliberative necessarily requires identifying the decision (and the associated decisional process) to which the record pertains. An agency invoking the deliberative-process privilege thus must 'establish what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" Thus, Defendant's Exemption 5 claims are too conclusory, even assuming a topic or date can be redacted because it is related to a policy decision. To be sure, the deliberative-process privilege may apply even when the agency never reaches a final decision, or the decision making may still be ongoing. That could happen, for instance, if an idea "dies on the vine" or meets a "dead-end." *Sierra Club*, 141 S. Ct. at 786. But to carry its burden in such a situation, the agency still must tie the withheld records to a decision-making process, even if that process did not ultimately result in a decision or is still ongoing. *CREW v. DOJ*, 45 F.4th 963, 972 (D.C. Cir. 2022).

But Defendant, while alleging based on inadmissible hearsay or on a basis that is entirely unclear from the cursory declarations of its "Branch Chief" FOIA Officer and its own in-house Counsel, that some of the redacted or withheld information relates to the agency's response to a "control deficiency," does meet this standard. The proferred declaration is insufficiently detailed to meet the agency's burden. Its description of the redacted meeting topics is vaguer than the descriptions courts have found too vague, such as saying that withheld information relates to "high tech policy issues," *ICM Registry, LLC v. U.S. Dept. of Commerce*, No. 06-cv-0949 (JR), 2007 WL 1020748, *6 (D.D.C. March 29, 2007), "wilderness issues," *Wilderness Society v. Dep. of Interior*, 344 F.Supp.2d 1, 12 (D.D.C. 2004),  "environmental testing and safety measures," *Judicial Watch*, 297 F.Supp.2d at 264, or "HLCG information sharing principles." *Electronic Frontier Foundation v. U.S. Dept. of Justice*, 826 F.Supp.2d 157, 168-70 (D.D.C. 2011).

17

Describing records as being related to an unspecified policy proposal is insufficient, because it contains essentially no information. See *FPL Group v. IRS*, 698 F.Supp.2d 66, 90 (D.D.C. 2010).

The agency's arguments relating to the work product privilege are even more cursory and fare no better under close scrutiny.

This Court explained in *Judicial Watch, Inc. v. United States DOJ*, 391 F. Supp. 3d 43, 50 (D.D.C. 2019) that "[t]he attorney work-product doctrine was explained in *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947), as intended to protect lawyers and their agents who are assembling facts and law in anticipation of litigation." In *Judicial Watch*, the Court traced the history of the work produce from *Hickman* to the present and held that "[t]oday, the attorney work-product doctrine protects documents that were prepared in anticipation of litigation by an attorney or an attorney's agent." Id., citing *United States v. Deloitte LLP,* 610 F.3d 129, 135, 391 U.S. App. D.C. 318 (D.C. Cir. 2010) and Fed. R. Civ. P. 26(b)(3)).

In evaluating whether material was prepared in anticipation of litigation, the D.C. Circuit has adopted a "because of" test. *Equal Emp't Opportunity Comm'n v. Lutheran Soc. Servs*., 186 F.3d 959, 968, 337 U.S. App. D.C. 373 (D.C. Cir. 1999). "This inquiry encompasses two related but distinct concepts—one a question of timing and the other a question of intent." *Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin*., 370 F. Supp. 3d 116, 135 (D.D.C. 2019) (citing *U.S. ex rel. Fago v. M & T Mortg. Corp*., 242 F.R.D. 16, 18 (D.D.C. 2007)). The threshold temporal inquiry considers "whether there was 'a subjective belief that litigation was a real possibility' at the time the document was prepared and whether that belief was 'objectively reasonable.'" *Id.* (quoting *Lutheran Soc. Servs*., 186 F.3d at 968).

Only once it is established that litigation was reasonably anticipated, the second element of the "because of" test—the motivational element"—"demands that the document be prepared

or obtained because of the prospect of litigation." *Animal Welfare*, 370 F. Supp. 3d at 135 (citing *Lutheran Soc. Servs.*, 186 F.3d at 968). "[T]he question is whether [the document] records information prepared by [the attorneys] or [their] representatives because of the prospect of litigation." Deloitte, 610 F.3d at 137.

In this case, the SEC cannot possibly meet the second prong of this two-part test for establishing work product protection, and has not attempted to do so in its declarations. SEC asserts that it conducted an internal review of the control deficiency, in which outside contractors were brought in to conduct forensic analyses of which staff inappropriately accessed the files of its administrative law judges. Does SEC seriously assert that it would not have conducted a review of its own impropriety but for the fear of being sued? But for the prospect of litigation, would the SEC have refused to cooperate with the requirements of the Inspector General Act, the demands of Congress, and common principles of management? Any confession that SEC initiated an investigation only because it feared litigation – under a "but for" standard of causation – assumes the very worst about government agencies and their inclination to carry on without properly accounting for or correcting malfeasance. While Plaintiff can occasionally be accused of such thinking, exactly the opposite presumption applies as a matter of law. *Palantir USG, Inc. v. United States*, 904 F.3d 980, 995 (Fed. Cir. 2018) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001) (for the proposition that agencies are entitled to a presumption of regularity.)

ii)   **The "Consultant Corollary" is atextual and, even if it exists, it does not protect the documents at issue in this case from disclosure.**

The so-called "consultant corollary" is found nowhere in the text of the Freedom of Information Act, and conflicts with the plain text of the statute. This Court should therefore decline to recognize this purported "corollary" to Exemption 5 at all. However, if the Court

nevertheless accepts the applicability, in general, of precedents which acknowledge the so-called "consultant corollary" it should strictly construe such precedents rather than further expand Exemption 5 here to allow SEC to utilize the consulting process, i.e., bring on private contractors in a fashion that evades the ordinary requirements of the Inspector General Act then shield those records from scrutiny.[12]

"Exemption 5 of FOIA… exempts from this requirement "inter-agency or intra-agency memorandums or letters" which would not be available by law to a party other than an agency in litigation with the agency. *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 4, 121 S. Ct. 1060, 1063 (2001), citing 5 USCS 552(b)(5). "Although neither the terms of the exemption nor the statutory definitions say anything about communications with outsiders, some Courts of Appeals have held that in some circumstances a document prepared outside the Government may nevertheless qualify as an 'intra-agency' memorandum under Exemption 5." *Klamath*, 532 U.S. at 9, 121 S. Ct. at 1066. Even in 2001, prior to the rise of textualism as an interpretive imperative,[13] the Supreme Court only "assumed, without deciding" that the consultant corollary was a possible interpretation of FOIA. *Id.*, 532 U.S. at 4, 121 S. Ct. at 1063. At least one judge of this Court recently recounted the history of judicial innovation in this arena, noted that Exemption 5 does "not say anything about communications with outsiders," and refused to expand the doctrine even further. *Georgia v. United States DOJ*, No. 1:21-cv-03138 (TNM),

---

[12] It appears that the business of contracting for SEC is quite lucrative. According to the Federal Procurement Data System (last visited Aug. 2, 2023), https://www.fpds.gov/ezsearch/search.do?q=Berkeley+Research+Group+DEPARTMENT_FULL_NAME%3A%22SECURITIES+AND+EXCHANGE+COMMISSION%22&s=FPDS.GOV&templateName=1.5.3&indexName=awardfull, there have been numerous contracts awarded to SEC's preferred internal investigative teams.

[13] The Supreme Court as recently as 2022 declared that it will not "stray[] from its commitment to textualism." *West Virginia v. EPA*, 142 S. Ct. 2587, 2625 (2022).

2023 U.S. Dist. LEXIS 28341, at *10 (D.D.C. Feb. 20, 2023). The Georgia case ecxpressly cautioned Exemption 5 "is not [meant] to protect Government secrecy pure and simple." *Id*.

This Court should reject outright application of the so-called "consultant corollary" to these facts and order that any and all documents shared with outside actors at the Berkley Research Group, General Dynamics, or any other outside contractor or entity identified in the SEC's Vaughn Index are to be immediately released to Plaintiff. Even if this Court accepts application of the consultant corollary here as a general principle, however, it must nevertheless reject the SEC's expansive and even farcical use of the corollary in this case.

In *Klamath*, the Supreme Court noted the lower courts that invented the consultant corollary had assumed that "the consultant functions just as an employee [of the agency] would be expected to do," 532 U.S. at 11. The lower courts which invented and applied this atextual doctrine, which is hostile to the text of the FOIA, assumed that so-called consultants do not properly represent "an interest of [their] own" nor "the interest of any other client when it advises the agency that hires [them]." *Id*. at 10-11.

In this case, the SEC asserts that, "the SEC retained BRG to support its internal review relating to the control deficiency." SEC further says that "During the internal review, BRG contractors compiled forensic data and engaged in discussion with SEC staff as part of SEC staff's review of certain databases to assess the scope and potential impact of the SEC's control deficiency." Tallarico Declaration, ECF No. 16-3, ¶ 1. A similar arrangement was apparently entered into by SEC with General Dynamics. *Id*., ¶12.

The chief problem with applying the consultant corollary to the documents at issue here, as SEC asserts this Court should do, is that the two "consultants" did not behave "just as an employee of the agency." The agency has clear statutory obligations to engage with its Inspector

General when its own malfeasance is uncovered and to cooperate with the Inspector General's Investigation. See, e.g., 5 U.S.C. § 401. Instead of complying with a statute that provides for an independent and impartial investigation with public reporting, the agency elected to evade the statutory scheme by paying outside "contractors" to conduct what it calls an "internal review." The agency and its employees were obligated to call in the Inspector General and cooperatei with his or her investigation. The Berkley Research Group and General Dynamicsare not proper substitutes, and therefore the consultant corollary cannot credibly be argued to apply, if in fact such a corollary is recognized in law in any manner at all.

### iii)   Any Exemption or Privilege that Arguably Attached has been Waived.

Assuming, *arguendo*, that Exemption 5 ever applied to the records at issue in this case, SEC voluntarily waived the protection of Exemption 5 by sharing the underlying documents with its favored vendors and issuing press releases linking to selected records, which necessarily call for a fuller explanation.

Deliberative process privilege is waived if an agency shares communications with private citizens or non-federal employees. See *Department of Interior v. Klamath Water Users Protective Assn.*, 532 U.S. 1, 9 (2001) (tribe's communications with agency were not covered by Exemption 5, even where agency labeled tribe as consultant and cited need for confidentiality; "'the communication must be "inter-agency or intra-agency.' 5 U. S. C. § 552(b)(5)," not "communications with outsiders"). To show communications are "intra-agency" or "inter-agency" for purposes of FOIA, and thus potentially privileged under Exemption 5, an agency must list the "names and affiliations of all senders and recipients," even "for documents that" are described by the agency as "purely internal." *People for the American Way Foundation v. U.S. Department of Educ.*, 516 F.Supp.2d 28, 30, 41-42 (D.D.C. 2007) (ordering agency to "submit a

new Vaughn index" including "the names and affiliations of all senders and recipients"; even "for documents that are purely internal to [the agency] the Vaughn index shall include the names and affiliations of all senders and recipients for each communication in addition to an explanation of why each document is predecisional and deliberative.").

Defendant's conclusory description of the communications as "internal" or as part of an "internal review" is not controlling. Agencies sometimes characterize communications with consultants and others as internal to the executive branch, even though courts deem such communications not "intra-agency" and thus not covered by exemption 5. See, e.g., *CEI v. OSTP*, 161 F.Supp.2d 120, 128, 134-35 (D.D.C. 2016) (agency claimed drafts "remained internal to the Executive Branch," but the court concluded that the consultant they were exchanged with was outside the Executive Branch for purposes of Exemption 5, waiving any deliberative process privilege claim; consultant was not "enough like the agency's own personnel to justify calling [her] communications `intra-agency,'" and so the draft pages were "not covered by the deliberative process privilege and cannot be withheld under Exemption 5.").

The work product privilege is similarly waivable, and waiver is the ordinary presumption when a party takes actions such as the SEC has taken in this case, by releasing certain records to the public by way of a press release while hiding other, less flattering or narrative-supporting records from release under FOIA. The doctrine of implied waiver "aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information." *Carr v. C.R. Bard, Inc*., 297 F.R.D. 328, 335 (N.D. Ohio 2014), citing *In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987). SEC's actions here are exactly that: "distortion of the judicial process."

In July of 2022, when the House Oversight Committee summoned SEC Chair Gary

Gensler, he instead sent Enforcement Director Grewal, who gave provably incorrect answers to Congress, declared ignorance on others and stonewalled. Now, SEC has dismissed dozens of cases following Supreme Court and Circuit Court holdings that cast grave doubt on the constitutionality of its administrative enforcement proceedings, both generally in terms of how ALJs were appointed and protected from removal and as applied in terms of the SEC's file-sharing between its quasi-judicial and quasi-prosecutorial arms. After dismissing these cases, the SEC ran to the press, declared that it had conducted a full "internal review," and the BRG report is all there is to know. Over a week after releasing this information to the media, the SEC also sent the press release to undersigned counsel for the Plaintiff as purported FOIA compliance. But the SEC simultaneously seeks to hide the underlying documents from the public, claiming that disclosure would be both harmful and violative of various privileges. By doing so, the SEC abuses the doctrine and distorts the judicial process that would ordinarily play out but for the SEC's machinations as herein described.

Having stonewalled Congress, precluded discovery by Cochran (and 41 others) after they won the right to challenge their adjudications in district court by dismissing those administrative proceedings, production of these public records under FOIA is both necessary and required by law. The SEC cannot selectively disclose information not only to its own contractors, but also to Congress, to its legal adversaries, and to the press, while claiming that disclosure under FOIA is somehow a bridge too far.

**B) Exemption 6 Does not Apply to These Records.**

Defendant has improperly withheld the names of government employees and "consultants" or "contractors" who helped the government evade transparency and the requirements of the Inspector General Act. The Tallarico Declaration explains that "Pursuant to

FOIA Exemption 6, the SEC withheld certain names, email addresses, and telephone numbers of SEC staff and SEC contractors. The SEC also withheld the names of SEC staff who were involved in the internal review, either as individuals who had access to the databases at issue in the control deficiency or as individuals being interviewed by the internal review team." ECF No. 16-3, ¶ 17.

Agencies don't usually withhold the names of staff — as opposed to private citizens — under Exemption 6. Exemption 6 case law generally requires agency employees' names to be released, even when that would not shed light on policymaking. See, e.g., *International Federation of Professional and Technical Engineers v. Superior Court*, 64 Cal.Rptr.3d 693 (Cal. 2007) (state government employees had no privacy right in their names or salaries, which had to be produced in response to public-records request); *National W. Life Ins. v. United States*, 512 F. Supp. 454, 461 (N.D. Tex. 1980) (no expectation of privacy in names and duty stations of Postal Service employees); *American Oversight v. HHS*,  2022 WL 1719001 (D.D.C. May 27, 2022), Slip Op. at 64 ("The Court concludes that Defendants are required to disclose the names of attendees and locations of meetings."). Defendant does not explain why the usual rule in favor of disclosure does not apply here. The agency also attempts to "have its cake and eat it too" by claiming that outside contractors are "private individuals" with respect to Exemption 6 but are somehow the functional equivalent of agency employees for purposes of the consultant corollary to Exemption 5.

Even private citizens' names should not be withheld when, as here, they are so influential they are conducting an "internal review" of SEC malfeasance and are apparently influencing the government's policy with respect to its own violations of due process in at least dozens of high-profile cases. It is blackletter law that the names of people lobbying government officials cannot

be withheld under Exemption 6. *EFF v. Office of the Director of National Intelligence*, 639 F.3d 876, 887-88 (9th Cir. 2010) ("public interest in obtaining information about the effects of lobbying on government decision making" outweighed "the privacy concerns of telecommunications industry lobbyists"). If releasing their names might help shed light on who is influencing agency policy – as is obviously true here -- then disclosure is warranted. See *People for the Am. Way Found v. National Park Service*, 503 F.Supp.2d 284, 306 (D.D.C. 2007) (even private citizens' names had to be released when they sought policy changes). Who these contractors and SEC's employees chose to lend an ear to is also of public interest. See, e.g., *Lardner v. DOJ*, No. 03--0180, 2005 WL 758267, at *17 (D.D.C. March 31, 2005) (ordering release of the names of unsuccessful pardon applicants, which would assist the public in analyzing the "circumstances in which the executive chooses to grant or deny a pardon and the factors that bear on that decision"); *Lardner v. DOJ*, 398 Fed. Appx. 609, 610 (D.C. Cir. 2010) (*per curiam*) (holding that public interest in names of unsuccessful clemency applicants outweighed applicants' privacy interests).

Disclosure of names is so mundane and unlikely to cause harm, as the 2016 FOIA Amendments require, that disclosing the "names" of the parties to a communication (including all staffers) is required for a Vaughn Index, *Coastal Corp. v. Dept. of Energy*, 496 F.Supp. 57, 59 (D. Del. 1980), and for establishing that privilege claims, including those claimed to be wholly internal to the government. See *People for the American Way Foundation v. U.S. Department of Education*, 516 F.Supp.2d 28, 30, 41-42 (D.D.C. 2007).

Defendant is also wrong to withhold staff and contractor email addresses. Purely private citizens' email addresses can generally be withheld (unless that is the only clue as to their identity), but see *Prechtel v. FCC*, 330 F.Supp.3d 320, 329-34 (D.D.C. 2018) (ordering citizens'

email addresses released where it was alleged that spam comments had been submitted by fake commenters), but government employees' email addresses usually can't be withheld, because they have no privacy interest in concealing their taxpayer-provided email address. See *Kleinert v. BLM*, 132 F.Supp.3d 79 (D.D.C. 2015) (finding that defendant did not meet its burden to support use of Exemption 6 to withhold email addresses). Defendant has not explained why that precept does not apply here, especially insofar as SEC wants to simultaneously claim that these particular contractors are the functional equivalent of government employees.

Defendant is also wrong to withhold staff and contractors' phone numbers from the records on its Vaughn Index. There is no privacy interest in such phone numbers that would justify withholding them. See *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005) ("no privacy interest" in telephone numbers used for work); *Brown v. FBI*, 873 F.Supp.2d 388, 402 (D.D.C. 2012) ("Work telephone numbers are different from personal information that would be protected"). Thus, the redacted staff and contractor phone numbers should all be produced.

### C)  The SEC's Vaughn Index is Riddled with Deficiencies.

Further, the *Vaughn* Index entries do not in fact describe why the withholdings are exempt, failing to satisfy a key requirement for a *Vaughn* Index. The standard requires "a detailed description…of the entire content of each withheld agency record or deletion from a released agency record" as well as "detailed justification statements giving particularized and specific justifications for each claim of exemption …[which] shall: …(d) contain specific factual or evidentiary material to support each element of a claimed exemption [and]… the specific injury to [the agency] which release would allegedly create; and (h) why the public interest does not favor disclosure." See, e.g., *Coastal Corp. v. Dept. of Energy*, 496 F.Supp. 57, 59 (D. Del. 1980).

The index submitted by Defendant is anything but "detailed" and makes only conclusory assertions as its explanation for the claimed exemptions. In each entry, SEC merely states that the communications meet the standard rather than describing how they do so.

The SEC's broad and repetitive reasons for withholding, through redactions and with numerous documents withheld in full, and without giving enough detail about the content to understand meaningfully why the documents were withheld, are facially inadequate. Without knowing which kind of information is in a redaction, the Court is hampered in assessing the validity of the claim, and the plaintiff is prevented from highlighting the weakness of even the weakest such claims. See *Campaign for Responsible Transplantation v. FDA*, 219 F. Supp. 2d 106, 116 (D.D.C. 2002) ("Without a proper *Vaughn* index, a requester cannot argue effectively for disclosure and this court cannot rule effectively.").

Moreover, neither declaration establishes that the withheld content is deliberative. The Tallarico Declaration states only the general topics of purported deliberations. The *Vaughn* Index ought to describe in more detail the pre-decisional deliberations to which this language relates, but barely makes an effort to do so in any way other than plugging in the name or reference to a rule to which the boilerplate refers. The declarant does not explain how the documents meet the standard, nor does he offer any factual basis for the assertions in the Vaughn log. Again: SEC's mere assertions of the applicability of an exemption do not suffice.

The agency's Vaughn must contain far more information than it does if SEC hopes to carry its burden to establish any of its claimed exemptions. "An agency invoking the deliberative-process privilege…must 'establish what deliberative process is involved, and the role played by the documents in issue in the course of that process.'…The agency… 'bears the burden of establishing the character of the decision, the deliberative process involved, and the role played by

the documents in the course of that process.'" *CREW v. DOJ*, 45 F.4th 963, 972 (D.C. Cir. 2022) (citations omitted). SEC's short *Vaughn* descriptions do not come close to meeting this burden. Indeed, SEC seems to substitute an *assertion of deliberation* for requisite facts that would establish deliberation. The character of the decisions in question is not mentioned in any of the *Vaughn* entries. Neither do any of them describe the deliberative process or the role of the documents in question, other than to use generalities or topics. ECF 16-3. These generalities could apply to nearly any document prior in time to proposed legislation or lit8igation. The extent to which the documents are actually reflective of a deliberative process is impossible for the court to assess without additional, non-generic, detail.

The bare assertion in the Tallarico Declaration at ¶ 18 and ¶ 20 that release of the messages at issue (see, *infra*) would somehow cause harm does not contain sufficient detail to show they are privileged. Not all agency decisions are covered by the deliberative process privilege. *See, e.g., Elkem Metals Co. v. U.S.*, 126 F.Supp.2d 567, 576-77 (C.I.T. 2000) (privilege did not protect "a draft of the ITC's issuance of a schedule for the conduct of its changed circumstances reviews," or agency's "draft of a proposed work schedule" or "another proposed work schedule"; items were "not protected by the deliberative process privilege," especially since "disclosure" of "scheduling information" would not "discourage candid discussions within the agency" and such information did not "reflect the give-and-take" of the agency's "decision-making process"); *Hennessey v. U.S. Agency For Intern. Development,* 121 F.3d 698, 1997 WL 537998, *5 (4th Cir. Sept. 2, 1997) (even "construction scheduling dispute" that gave rise to legal claim against agency was not shielded by deliberative-process privilege because it did "not bear on a policy-oriented judgment of the kind contemplated by Exemption 5"; even if a "decision" regarding such a matter "can be regarded as a 'policy,'" it is not the "'stuff' of the deliberative process privilege" if it is at the "very outer

limits" of what is a policy).  Without a sufficiently detailed *Vaughn* index, it is impossible for

Plaintiff to know if the cited exemptions apply, or are as they appear on their face to be, merely

recitations of the standard.

Defendant's *Vaughn* Index entries are far less detailed than the descriptions courts have

found too lacking in detail to support a deliberative-process privilege claim, for example saying

that withheld information relates to "high tech policy issues," *ICM Registry, LLC v. U.S. Dept. of

Commerce*, No. 06-cv-0949 (JR), 2007 WL 1020748, *6 (D.D.C. March 29, 2007), "wilderness

issues," *Wilderness Society v. Dep. of Interior*, 344 F.Supp.2d 1, 12 (D.D.C. 2004),

"environmental testing and safety measures," *Judicial Watch,* 297 F.Supp.2d at 264, or "HLCG

information sharing principles." *Electronic Frontier Foundation v. U.S. Dept. of Justice*, 826

F.Supp.2d 157, 168-70 (D.D.C. 2011).  Similarly, SEC's *Vaughn* index simply claims the covered

documents are related to "ESG" or "climate-related rulemaking."

Just because withheld documents are related to the "control deficiency" is insufficient to

establish that they are deliberative in nature. "We reemphasize the narrow scope of Exemption 5

and the strong policy of the FOIA that the public is entitled to know what its government is doing

and why. The exemption is to be applied "as narrowly as consistent with efficient Government

operation." *Coastal States Gas Corp. v. Dep't of Energy*, 199 U.S. App. D.C. 272, 617 F.2d 854,

868 (1980). (internal citations omitted).

### III.    Defendant Does Not Show the Harm Needed to Withhold or Redact the Responsive Records it Does Acknowledge.

Assuming, *arguendo*, that SEC had met the burden to establish that Exemption 5 or 6

applied at all, SEC nevertheless does not "concretely explain how" and "why actual harm would

foreseeably result from release," which is an independent requirement under the 2016 FOIA

Amendments before material otherwise privileged under Exemptions 5 and 6 can be withheld.

*Reporters Committee v. FBI*, 3 F.4th 350, 369-71 (D.C. Cir. 2021), citing 5 U.S.C. § 552(a)(8)(A)(i)(I). SEC instead makes general statements, none of which adequately describe the harm that would result from release, and so all of which fail to meet SEC's burden.

"Congress added the distinct foreseeable harm requirement to foreclose the withholding of material unless the agency can "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld. Agencies cannot rely on "mere 'speculative or abstract fears,' or fear of embarrassment" to withhold information. Nor may the government meet its burden with "generalized assertions[.]" *Reporters Comm. for Freedom of the Press v. FBI*, 453 U.S. App. D.C. 50, 69, 3 F.4th 350, 369 (2021) (internal citations omitted).

The *Vaughn* Index does not allege that release of the identified record(s) would reasonably foreseeably cause harm or have any chilling effect on agency deliberations or how or why. *See* ECF No. 16-3.

Similarly, the declarations do not adequately establish the potential for harm. The Tallarico Declaration, ECF No. 16-3, contains only three mentions of the word "harm" (once at ¶ 18 and twice in ¶ 20) and zero references to how the agency balanced any privacy interests against any public interest before or during its "foreseeable harm" analysis. The Katilius Declaration adds no substance and fails to even cursorily examine the topic of foreseeable harm or personal privacy interests.

With no reasonably articulated or plausible ill effect, it is hard to fathom how release of the withheld information in the correspondence here, which SEC has already publicly acknowledged reflects a glaring internal deficiency in SEC's administrative adjudication process. No explanation of how disclosure would or could cause further harm here is attempted, much less

provided. Indeed disclosure can only benefit both the agency and the public by providing assurances that identified and public deficiencies have already been or are being corrected. Defendant never addresses this beyond general, boilerplate conclusory statements. Embarrassment is not an exemption to FOIA, and the fact of embarrassing facts having been revealed, seriously impacting numerous prosecuted parties' rights, only enhances the imperative for public release.

How would the release of such information relating to a topic that has already been publicly acknowledged and ostensibly corrected cause public confusion or interfere with SEC's duties, including its duty of candor to the courts and its duties of disclosure to those it prosecutes? The declarants do not explain how, and simply assert that it will as if such a truth were somehow self-evident. Plaintiff cannot speculate as to SEC's fears or its basis, and this Court should similarly refrain and hold SEC to its burden of proof.

The D.C. Circuit in *Reporters Committee* found "wholly generalized and conclusory" an agency exemption claim that disclosure of whether a now-proposed rule was going to include or address a particular matter "would chill full and frank discussions between agency personnel and decision makers regarding a decision." *Reporters Committee v. FBI*, 3 F.4th at 370. It found insufficiently detailed the statement that:

> Disclosure … would have an inhibiting effect upon agency decisionmaking and the development of policy because it would chill full and frank discussions between agency personnel and decision makers regarding a decision. If agency personnel know that their preliminary impressions, opinions, evaluations, or comments would be released to the general public, they would be less candid and more circumspect in expressing their thoughts, which would impede the fulsome discussion of issues necessary to reach a well-reasoned decision.

Defendant's explanation for why release of the redacted material would allegedly chill the staff's ability to do their work is also far shorter, less detailed, and less unequivocal than the explanation found both "vague" and "insufficiently specific" in *Project on Government Oversight*

*v. DHS*, Case No. l:18-CV-2051-RCL (Feb. 20, 2023), Memorandum Opinion, at pp. 16-17,

https://ecf.dcd.uscourts.gov/cgi-bin/show_public_doc?2018cv2051-62, even though the

defendant in that case explained in more detail than the case at bar that disclosure would "severely

undermine" its "ability" to "investigate" violations of civil rights and civil liberties.

In that case, the agency stated, in far more detail (at pg. 17) that:

Court-ordered disclosure of the information would severely undermine the Department's ability to efficiently and effectively investigate allegations of civil rights or civil liberties violations, and for its investigators and decision-makers at various points of the decisional process outlined above to offer uninhibited opinions and recommendations on the matters at issue. Without the continued assurance of confidentiality, CRCL's expert consultants would not provide the Department with the meaningful information it needs to properly investigate civil rights complaints. Maintaining the confidentiality of these types of predecisional and deliberative communications is critical for the Department to carry out its mission…

Disclosure of this information would chill the free and frank exchange of ideas and recommendations at DHS, including between CRCL's expert and CRCL, and between CRCL and the affected DHS component agencies that have been the subject of complaints that require investigation. Release of the information would severely undermine the Agency's ability to efficiently and effectively investigate allegations of civil rights or civil liberties violations, and for its investigators and decision-makers at various points of the decisional process ... to offer uninhibited opinions and recommendations on the matters at issue.

Defendant's assertion of foreseeable harm is also far less detailed and specific than that

found "insufficiently specific" in *Project on Government Oversight v. DHS*, Case No. l:18-CV-

2051-RCL (Feb. 20, 2023), Memorandum Opinion, at pg. 18, https://ecf.dcd.uscourts.gov/cgi-

bin/show_public_doc?2018cv2051-62, where the agency said:

Moreover, release could cause unnecessary public confusion .... [T]he Reports contain the experts' preliminary findings and recommendations. The Reports contain the experts' unverified observations of first impression. For any number of reasons, the Department may not necessarily agree with, or adopt the experts' findings or recommendations. In the Department's view, release of the experts' preliminary findings and recommendations poses a substantial risk of confusing the public as to any eventual final actions of the Department concerning the complaints in question, or the reasons for them.

Defendant's submissions fall far short of all of these examples, none of which were deemed sufficient by courts to support a claim of harm justifying non-disclosure.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

Respectfully submitted this the 2nd day of August, 2023,

/s/ Matthew D. Hardin
Matthew D. Hardin, D.C. Bar # 1032711
Hardin Law Office
1725 I Street NW, Suite 300
Washington, DC 20006
(202) 802-1948
MatthewDHardin@gmail.com

*Counsel for Plaintiff*